UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

XPO LOGISTICS, INC., a Delaware
corporation, and XPO LAST MILE, INC.,
a Georgia corporation

            Plaintiffs,                  Case No.  _____

-vs-                                 Hon. _____

WILLIAM YOUNG, an individual,

            Defendant.

---

JACKSON LEWIS P.C.
Katherine J. Van Dyke (P62806)
Daniel C. Waslawski (P78037)
2000 Town Center, Suite 1650
Southfield, MI 48075
(248) 936-1900
katherine.vandyke@jacksonlewis.com
daniel.waslawski@jacksonlewis.com
Attorneys for Plaintiffs

---

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs XPO Logistics, Inc. ("XPO") and XPO-LM, Inc. ("XPO-LM"), for their Complaint for Injunctive and Other Relief against Defendant William Young ("Young"), state the following:

**NATURE OF ACTION**

1.    This action is based on Young's willful and intentional breach of his non-competition provision in his employment agreement with Plaintiffs; his

tortious interference with Plaintiffs' existing contractual and business relationships; his defamatory statements regarding Plaintiffs' business operations; and his breach of his fiduciary duties owed to Plaintiffs.

## PARTIES

2.    XPO is a corporation organized under the laws of Delaware with its principal place of business located at 5 Greenwich Office Park, Greenwich, Connecticut 06831.

3.    XPO-LM is a corporation organized under the laws of Georgia with its principal place of business located at 1851 West Oak Parkway, Marietta, Georgia 30062.  XPO-LM is a wholly-owned subsidiary of XPO.

4.    Young is an individual and former employee of XPO who resides at 36511 Rolf St., Westland, MI 48186.

## JURISDICTION AND VENUE

5.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy is over $75,000 exclusive of interest and costs.

6.    Plaintiffs seek immediate injunctive relief pursuant to Federal Rule of Civil Procedure 65(a).

7.    Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action

occurred within the Eastern District of Michigan, and Young is subject to personal jurisdiction in this District.

## FACTS

### A.    Plaintiffs' Business

8.    XPO-LM is a third-party logistics company that operates as an authorized freight forwarder for its customers, such as retailers and distributors of furniture, appliances, home exercise equipment, large electronics, and other heavy goods. In this capacity, XPO-LM enters into delivery service agreements ("DSAs") with independent motor carriers ("Contract Carriers" or "Owner-Operators"), which, in turn, provide last mile delivery services.  A "last mile delivery" involves moving goods from a transportation hub to a final destination, such as a consumer's home.

9.    As a freight forwarder, XPO-LM does not sell the products that its customers sell, and XPO-LM does not deliver those products because it does not have the necessary licensing authority to deliver freight. Instead, XPO-LM receives the product from a retailer and then provides the product to a Contract Carrier for delivery to the end consumer.

10.    Indeed, XPO-LM's customers operate upstream from XPO-LM in the supply chain, while Contract Carriers—as motor carriers authorized to deliver freight—occupy another level of the supply chain that is downstream from both the

3

retailer and XPO-LM.

11.    For the supply chain to properly function (*i.e.*, in order for freight to move from a retailer to XPO-LM to a contract/motor carrier to the consumer), XPO-LM must maintain its business relationship with both retailers (so that it has freight to forward) and Contract Carriers (so that the freight is delivered).

12.    XPO-LM's business relationships with retailers and Contract Carriers are crucial to the success of its business operations. Absent these business relationships and related contractual agreements, XPO-LM's business does not function.

**B.    XPO-LM's Facility in Romulus, Michigan**

13.    To move goods from retailers to the consumer, XPO-LM has facilities in different geographical areas. These facilities are known as market delivery centers ("MDCs"). MDCs are of crucial importance to XPO-LM's business operations. Among other functions, MDCs store the products of XPO-LM's customers (*i.e.,* the retailers and distributors).

14.    Pursuant to the DSAs and business relationships between XPO-LM and Contract Carriers, Contact Carriers deliver XPO-LM's customers' products from the MDCs to end consumers of the products.

15.    XPO-LM maintains and operates an MDC in Romulus, Michigan. This facility is referred to as MDC-DTW.

4

16.    A significant portion of the revenue that XPO-LM derives from its business operations at MDC-DTW originates from a large multinational retailer of consumer goods that has a significant and continuous presence in the Midwest region of the United States. XPO-LM generates large amounts of revenue by serving as a freight forwarder of this large multinational retailer's products.

**C.    Young's Employment with XPO**

17.    XPO hired Young as an Operations Manager II at MDC-DTW on March 13, 2015.

18.    XPO was the employer of record for the employees, including Young, while the business with the client retailers, client distributors, and Contract Carriers operated through XPO-LM.

19.    As an Operations Manager at MDC-DTW, Young's responsibilities included but were not limited to:  building relationships with Plaintiffs' customers; working with Plaintiffs' staff on pricing, competitive advantages, and disadvantages to facilitate new avenues of growth and protect Plaintiffs' business interests; facilitating the execution of DSAs with Contract Carriers; identifying Contract Carriers qualified to provide last mile delivery services; and supervising and managing subordinate supervisors who, in turn, supervise warehouse associates and dispatchers.

20.    Young also had primary responsibility for interfacing with two

customers, in addition to overseeing the dispatching out of MDC-DTW for all customers.

21. One of Plaintiff's customers over which Young had primary responsibility was the large multinational retailer described above. This retailer is XPO-LM's largest volume and revenue-generating retailer for MDC-DTW.

22. Among other things, Young was responsible for ensuring that Plaintiffs maintained a positive, ongoing business relationship with this large multinational retailer. Because this entity provides a signification portion of Plaintiffs' revenue, Young's responsibility of interfacing with this customer was of crucial importance to Plaintiffs' business operations.

23. Plaintiffs provided Young with confidential and proprietary information, so that he could perform his job duties as Operations Manager.

24. The confidential/proprietary information included, but is not limited to: price lists; non-public financial information; customer and Contract Carrier lists and/or identities; compensation arrangements; personnel information; mark-up information for the Contract Carriers; profit and loss information; and customer volume and revenue information. Young also knew, among other things, the specific requirements of the Contract Carriers, including the minimum number of routes and rates that each of the businesses require as a condition of their contractual relationships with Plaintiffs.

6

**D.**    **Young's Employment Agreement**

25.    On March 13, 2015, Young executed an "Employment Agreement" with XPO, a copy of which is attached hereto as Exhibit A.

26.    The Employment Agreement expressly provides that it is executed for the benefit of XPO and its subsidiaries and affiliates (*i.e.*, XPO-LM).

27.    The Employment Agreement also contained non-compete and non-solicit provisions.

28.    The non-competition provision, provided, in pertinent part:

*Covenant Not to Compete With Us.*

(a)    ***Duration and Geographic Scope.***  While you are employed by us and for a period of six (6) months after your employment ends, whether on account of your resignation or because we terminated your employment with or without Cause, (the "***Restricted Period***"), you are not allowed to compete with us in the "***Restricted Territory***" (geographic area) fixed below.  This undertaking on your part for our benefit is called your "***Non-Compete Covenant***."

(b)    ***Your Non-Compete Covenant to Us***.  Subject to the Restricted Period extension and Non-Compete waiver provisions described below, you expressly agree that both while employed by us and during the Restricted Period, you will not (either directly or indirectly through others) have any of the following business relationships anywhere within your Restricted Territory:

(i)    Perform any services, whether as an employee, agent or independent contractor, which are the same as or reasonably related to the services you performed while employed by us during the last two years of your employment with us, for a "***Competing  Business***" (defined below);

\* \* \*

7

(c)     ***Definition of a "Competing Business".***  You and the Company agree that a "***Competing Business***" means any individual or business (e.g., a corporation or limited liability company) engaged in our business as we are conducting it on the date your employment with us ends (including any business we are then actively considering or were considering at any time during the 12 month period ending on the date of your termination), including by way of example:

(i)     any providers of third-party logistics services, including only by way of illustration, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics or intermodal providers, or firms such as CH Robinson, Coyote Logistics, Expeditors International of Washington, Inc., Echo Global Logistics Inc., Total Quality Logistics, Roadrunner Transportation Systems, TransCore, Internet Truckstop LLC, syncreon, Neovia Logistics, Jacobson Companies and Hub Group Inc.; and

(ii)     an individual or business that otherwise competes with our business anywhere in the Restricted Territory.  [Ex. A at p. 7.]

29.     Pursuant to the non-solicitation provision of the Employment

Agreement, Young also agreed as follows:

***Covenant Not to Solicit the Company's Restricted Customers and Carriers.***

(a)     ***Agreement Not to Solicit***.  While employed by us and for the two (2) years thereafter, you agree that you will not (nor will you assist any other person or entity to), for any reason, either directly or indirectly, call on, contact, solicit or otherwise take away or disrupt, or attempt to call on, contact, solicit or other otherwise take away or disrupt, our relationship with or business expectancy from any of our customers or carriers (i) on whose account you worked or with whom you had regular contact or (ii) as to whom you had access to Confidential Information (in either instance at any time within the last one (1) year of your employment with us).  This undertaking on your part for our benefit is called your "***Non-Solicit Covenant***."  [Ex. A at p. 6.]

8

**E.**     **Young's Resignation of His Employment with XPO and Violation of the Employment Agreement**

30.     On July 3, 2017, Young abruptly tendered his resignation of employment.

31.     Members of Plaintiffs' management subsequently learned that Young resigned his employment in order to begin employment with North American Logistics Group ("NAL").

32.     NAL is a direct competitor of Plaintiffs.

33.     On July 13, 2017, members of Plaintiffs' management met with Young to discuss his resignation of employment.  They informed Young that they received information indicating that Young was going to begin employment with NAL.  They advised Young that his Employment Agreement contained a covenant not to compete with Plaintiffs' business.

34.     In response, Young denied that he was going to work for NAL and acknowledged his awareness of the non-competition covenant.  Instead, Young explained to Plaintiffs' management that he was going to assist his aunt with her tree-trimming and home renovation business.

35.     Young's resignation of employment with Plaintiffs was effective July 14, 2017.

36.     Young's denial of going to work for a competitor turned out to be false.

9

37.    Plaintiffs recently learned from a Contract Carrier that Young is, in fact, working for NAL.

38.    Upon information and belief, Young begins work with NAL on or around July 27, 2017—if he has not already done so.

39.    NAL is a "Competing Business" and is located within the "Restricted Territory" as those terms are defined in the Employment Agreement.

40.    Indeed, XPO-LM competes nationally with NAL for the business of the large multinational retailer discussed above.

**F.    Young's Wanton Disregard of His Job Responsibilities before His Last Day with Plaintiffs**

41.    Shortly after Young resigned his employment, Plaintiffs' upper management discovered that the conditions at MDC-DTW were in an unacceptably poor state.

42.    Specifically, Plaintiffs discovered that large amounts of warehouse space were unused despite the fact that customer inventory littered areas of the warehouse not designed for storing inventory.

43.    This state of neglect was so pervasive that it appears that Young, while still employed with XPO, ceased tending to and performing his responsibilities as Operations Manager.

44.    Plaintiffs' management also discovered that Young failed to audit the inventory of Plaintiffs' customers stored at MDC-DTW for over a full month

10

preceding his resignation, despite having responsibility for ensuring weekly completion of audits.

45.    Young's failure to ensure that the employees under his supervision conducted audits jeopardized Plaintiffs' ability to account for their customers' products.

46.    Plaintiffs' management also learned that Young failed to train personnel under his supervision on the newly-implemented internal logistical systems that Plaintiffs implemented for the purpose of providing services to their customers.

47.    The internal logistical systems that Plaintiffs use are crucial to Plaintiffs' ability to provide freight forwarding services for their customers.

48.    Young failed to train his subordinates despite having responsibility to do so and despite representing that said personnel completed their training.

49.    Upon information and belief and coupled with the fact that Young made defamatory statements to Plaintiffs' customers regarding Plaintiffs' business operations, Young intentionally failed to perform his job responsibilities for the purpose of harming Plaintiffs' business operations and relationships with their customers so that their customers would pursue alternative business relationships with NAL.

11

**G.**    **Young's False Statements to Plaintiffs' Largest Customer**

50.    Following Young's resignation of employment, Plaintiffs learned that Young made false statements regarding Plaintiffs' business operations to representatives of Plaintiffs' largest customer for the MDC-DTW, which is the above-described large multinational retailer.

51.    Young admitted to Plaintiffs' management that he informed this customer that Plaintiffs' lacked sufficient warehouse space to store the retailer's products and that all of Plaintiffs' employees were leaving because of poor working conditions.

52.    Young made the foregoing false statements in an attempt to disrepute and damage Plaintiffs' business relationship with a crucial customer and wrongfully solicit the business opportunity for the benefit of NAL.

**H.**    **The Irreparable Harm to Plaintiffs**

53.    Young's actions, as described above, violate the Employment Agreement.

54.    Because of Young's violations of his Employment Agreement, his breach of fiduciary duty, defamatory statements, and interference with Plaintiffs' business relationships, Plaintiffs are suffering irreparable harm and injury to their business and customer goodwill and their goodwill and relationships with the Contract Carriers.

12

## COUNT I
## <u>INJUNCTIVE RELIEF</u>

55.     Plaintiffs repeat and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

56.     By virtue of the allegations set forth herein, Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims and that a balancing of the equities favors the issuance of an injunction against Young.

57.     Unless Young is temporarily, preliminarily, and/or permanently enjoined from violating his Employment Agreement and engaging in the conduct described above, Plaintiffs will be irreparably harmed by their loss of competitive advantage, and market position; damage to office stability; and injury to their customer and Contract Carrier goodwill and relationships.

58.     Present economic loss is unascertainable at this time, and future economic loss is presently incalculable.

59.     Plaintiffs have no adequate remedy at law.

## COUNT II
## <u>BREACH OF CONTRACT – NON-COMPETITION</u>

60.     Plaintiffs repeat and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

61.     Young's Employment Agreement with Plaintiffs is a valid and enforceable contract.

13

62.     Pursuant to Paragraph 7 of the Employment Agreement, Young agreed not to work for a competitor of Plaintiffs and/or provide similar services provided by Plaintiffs within the "Restricted Territory" as defined in the Employment Agreement.

63.     Young now works for NAL, a direct competitor of Plaintiffs, within the Restricted Territory as defined in the Employment Agreement.

64.     Young's conduct constitutes a breach of the Employment Agreement.

65.     As a direct and proximate result of Young's wrongful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, as well as monetary damages insufficient to fully remedy Plaintiffs.

## COUNT III
## DECLARATORY JUDGMENT

66.     Plaintiffs repeat and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

67.     An actual, present and justiciable controversy has arisen between Plaintiffs and Young concerning the validity of Young's contractual obligations and covenants set forth in the Employment Agreement

68.     Plaintiffs anticipate that Young will breach his non-solicit provision in his Employment Agreement, in addition to his continued breach of the non-compete provision.

69.     Plaintiffs seek judgment from this Court declaring that the

14

Employment Agreement, including both the non-compete and non-solicit provisions, are valid and binding on Young.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

70.    Plaintiffs repeat and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

71.    Young owed a fiduciary duty of loyalty to Plaintiffs during his employment.

72.    Young breached his fiduciary duty of loyalty to Plaintiffs by, among other things, abdicating his managerial and other job responsibilities before his last day worked with Plaintiffs for the purpose of disrupting and harming Plaintiffs' business operations and interfering with their business relationships with their customers and the Contract Carriers.

73.    While employed at XPO, Young violated his duty of loyalty and did not act in Plaintiffs' best interests.

74.    Young's breach of this duty proximately caused Plaintiffs to sustain damages, including, but not limited to, lost profits, revenues, and damage to good will.

## COUNT V
## BUSINESS DEFAMATION

75.    Plaintiffs repeat and incorporate the allegations set forth in the

preceding paragraphs as if fully set forth herein.

76.    Plaintiffs possess business relationships and expectancies with their current and prospective customers, as alleged above, with a reasonable likelihood of future economic benefit to Plaintiffs.

77.    As alleged above, Young's false statements prejudiced Plaintiffs' business by attempting to deter Plaintiffs' customers from doing business with Plaintiffs.

78.    By Young's conduct alleged above, Young intentionally and improperly made false and *per se* defamatory statements regarding Plaintiffs' business operations to their customer.

79.    Young's conduct alleged above was intended to interfere with Plaintiffs' business relationships and expectancies and denigrate Plaintiffs' business reputation.

80.    As a direct and proximate result of Young's wrongful conduct, Plaintiffs have suffered economic injury, loss of goodwill, harm to their reputation, and loss of business opportunities.

## COUNT VI
## TORTIOUS INTERFERENCE WITH
## CONTRACTUAL AND BUSINESS RELATIONSHIPS

81.    Plaintiffs repeat and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

16

82.    Plaintiffs have contractual and economic relationships with their employees, customers, and Contract Carriers, of which Young has knowledge.

83.    Young wrongfully interfered with Plaintiffs' existing contractual and business relationships by abdicating his managerial and other job responsibilities and making the false statements described above

84.    Young's engaged in these acts with full knowledge and/or recklessness and want of ordinary care in that such acts or omissions would necessarily interfere with or disrupt the contractual and economic relationships that Plaintiffs have enjoyed with their customers, Contract Carriers, and vendors.

85.    Young's conduct was intentional and willful as he intended to harm Plaintiffs' contractual, economic, and financial interests.

86.    Young's conduct was wrongful and not justified, privileged, or excusable.

87.    As a direct and proximate result of Young's wrongful conduct, Plaintiffs have suffered economic injury, loss of goodwill, harm to their reputation, and loss of business opportunities.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment in their favor against Young and requests that this Court enter an Order:

A.    Enjoining Young temporarily, preliminarily, and permanently from,

17

directly or indirectly:

1) Working for a direct competitor of Plaintiffs, including, but not limited to, NAL, for six months from the date of this Court's order;

2) Soliciting Plaintiffs' customers and the Contract Carriers or otherwise disrupting Plaintiffs' business relationships with said parties for two years from the date of this Court's order;

3) Using or disclosing Plaintiffs' confidential information; and

B.      Preliminarily and/or permanently prohibiting, restraining, and enjoining Young from tortiously interfering with Plaintiffs' customer and vendor relationships.

C.      Preliminarily and/or permanently prohibiting, restraining, and enjoining Young from making any false statements regarding Plaintiffs' business to any third-parties, including without limitation, Plaintiffs' customers, prospective customers, employees, and the Contract Carriers.

D.      Declaring that the Employment Agreement, including both the non-compete and non-solicit provisions, are valid and binding on Young.

E.      Awarding Plaintiffs their attorneys' fees and costs.

F.      Awarding Plaintiffs compensatory damages arising out of Young's unlawful conduct.

18

G.     Awarding Plaintiffs punitive/exemplary damages pursuant to statutory

and/or common law.

H.     Granting Plaintiffs such additional relief as is just and proper.

                            Respectfully submitted,
                            JACKSON LEWIS P.C.
                            /s/ Katherine J. Van Dyke
                            KATHERINE J. VAN DYKE (P62806)
                            DANIEL C. WASLAWSKI (P78037)
                            2000 Town Center, Suite 1650
                            Southfield, MI 48075
                            (248) 936-1900
                            katherine.vandyke@jacksonlewis.com
                            daniel.waslawski@jacksonlewis.com
Dated:  July 26, 2017       Attorneys for Plaintiffs

4825-0113-8508, v. 2

# EXHIBIT A

# EMPLOYMENT AGREEMENT

In this EMPLOYMENT AGREEMENT (the "***Agreement***"), the terms "***we***," "***us***," "***our***," and "***the Company***" mean, collectively, XPO LOGISTICS, INC., a Delaware corporation, together with its existing and future subsidiaries and controlled affiliates. "***You***," "***your***," "***me***" and "***the Employee***" mean the specific employee of the Company whose signature appears on the last page of this Agreement. To help explain the obligations created under this Agreement, we use certain capitalized terms (e.g., "***Confidential Information***," "***Cause***," etc.), which are defined (in alphabetical order) in Section 19, below.

## Background Information

This Agreement is a condition of your employment by the Company. You acknowledge that we are employing you in consideration for your execution and delivery of this Agreement.

We are a third-party transportation logistics business. Our customer and carrier lists, pricing strategies, operating processes, methods and procedures, our information technology, our training programs, our business plans, and our other highly confidential or proprietary information are of vital importance to us. We therefore need to be sure that our employees agree to protect the Company regarding these matters, including, for example, our Confidential Information, our intellectual property, returning Company property upon our request, not trying to hire away our employees, not competing with us, not soliciting our customers, not saying bad things about us, and certain other matters as set forth in this Agreement.

## Agreement

In consideration of the Background Information above (which constitutes an important part of this Agreement) and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, you and the Company agree as follows:

1. ***Employment At-Will.*** We desire to employ you and you desire to be employed by us. Nothing in this Agreement changes your at-will employment status or confers any right with respect to continuation of employment by us, and nothing in this Agreement interferes in any way with your right or our right to terminate your employment at any time, with or without Cause or advance notice.

2. ***Confidentiality Covenant.*** You agree to use our Confidential Information only for our benefit. You agree that other than as required by you to perform your duties for us, you will not, at any time, directly or indirectly use, disclose or copy our Confidential Information or assist any other person or entity to do so.

3. ***Return of Company Property When Requested.*** You agree to promptly return to us when we request, but in any event by the last day of your employment with us, all of our Confidential Information and all other Company property (tangible or intangible) in your possession or control (e.g., all documents, data, recordings, smartphones, computers and other business equipment, inclusive of all information stored in electronic form), obtained or prepared by or for and utilized by you in the course of your employment, all of which you acknowledge and agree is and shall remain our sole and exclusive property.

4. ***Ownership of Intellectual Property.*** Except as otherwise provided by applicable law, you agree that all "***Work Product***" (as that term is defined in Section 19) created in whole or in part by you while employed by us is our exclusive property, and that you will promptly, fully and effectively communicate

*Employment Agreement (1-8-15) -- Page 1*

all Work Product to us. Accordingly, you agree that all Work Product eligible for any form of copyright protection made or contributed to in whole or in part by you within the scope of your employment while so employed shall be deemed a "***work made for hire***" under the copyright laws and shall be owned by us. Further, you hereby now (and upon our request, in the future you will) assign, transfer and convey to us, all of your "***Proprietary Rights***" (as that term is defined in Section 19) in all Work Product for our exclusive ownership and use, together with all rights to sue and recover for past and future infringement or misappropriation thereof. In addition, at our request, at all times while you are employed by us and at all times thereafter, you agree to promptly and fully assist us in effecting the foregoing assignment, including but not limited to the further acts of executing any and all documents necessary for us to secure for ourselves such Proprietary Rights in all such Work Product. YOU ARE HEREBY ADVISED, HOWEVER, THAT THE FOREGOING PROVISIONS DO NOT APPLY TO any invention (i) for which none of our equipment, supplies, facilities or Confidential Information were used, and (ii) developed entirely on your own time, unless the invention relates to our businesses or any actual or demonstrably anticipated research or development, or results from any work performed by you for us.

5. ***Covenant Not to Hire the Company's Employees and Others.*** While employed by us and for two (2) years thereafter, you agree not to directly or indirectly hire or interfere (or try to hire or interfere) in any way with (or help any other person or party to (or to try to) hire or in any way to interfere with) our relationship with (i) any of our employees, (ii) any of our independent contractors (iii) any employee of a third party that has an "independent participant" relationship with us and (iv) any person who at any time during the six (6) months prior to such hiring or interference was described by clauses (i), (ii) or (iii) of this paragraph. This undertaking on your part for our benefit is called your "***Anti-Hiring Covenant***."

6. ***Covenant Not to Solicit the Company's Restricted Customers and Carriers.***

(a) ***Agreement Not to Solicit.*** While employed by us and for the two (2) years thereafter, you agree that you will not (nor will you assist any other person or entity to), for any reason, either directly or indirectly, call on, contact, solicit or otherwise take away or disrupt, or attempt to call on, contact, solicit or otherwise take away or disrupt, our relationship with or business expectancy from any of our customers or carriers (i) on whose account you worked or with whom you had regular contact, or (ii) as to whom you had access to Confidential Information (in either instance at any time within the last one (1) year of your employment with us). This undertaking on your part for our benefit is called your "***Non-Solicit  Covenant***."

(b) ***You Acknowledge the Legitimacy, Reasonableness and Fairness of Your Non-Solicit Covenant To Us.*** You acknowledge that: (i) in the course of performing your duties as a sales employee and/or an employee who has had and/or will have direct contact with our customers or carriers and/or access to proprietary information about them, you will have access to, and be regularly exposed to, and in some cases will generate and control, Confidential Information which is sensitive, and competitively valuable information about us; (ii) we have developed our Confidential Information through considerable time, effort and expense; (iii) our relationships with our customers, carriers, vendors, suppliers, business partners and employees, as well our Confidential Information, constitute valuable and legitimate protectable business interests of ours; (iv) your Non-Solicit Covenant is reasonable and necessary to protect those interests, our Confidential Information and our goodwill; and (v) your compliance with your Non-Solicit Covenant following termination of your employment will not prevent you from earning a livelihood in a business similar to our business, but, in any event, your experience and capabilities are such that you now have and will have other opportunities to earn a livelihood and adequate means of support for yourself and your dependents.

*Employment Agreement (1-8-15) -- Page 2*

7.   *Covenant Not to Compete with Us.*

(a)   ***Duration and Geographic Scope.***  While you are employed by us and for a period of six (6) months after your employment ends, whether on account of your resignation or because we terminated your employment with or without Cause, (the "***Restricted Period***"), you are not allowed to compete with us in the "***Restricted Territory***" (geographic area) fixed below. This undertaking on your part for our benefit is called your "***Non-Compete Covenant***."

(b)   ***Your Non-Compete Covenant to Us.***  Subject to the Restricted Period extension and Non-Compete Covenant waiver provisions described below, you expressly agree that both while employed by us and during the Restricted Period, you will not (either directly or indirectly through others) have any of the following business relationships anywhere within your Restricted Territory:

(i)   perform any services, whether as an employee, agent or independent contractor, which are the same as or reasonably related to the services you performed while employed by us during the last two years of your employment with us, for a "***Competing Business***" (defined below);

(ii)   own any financial interest in a Competing Business (e.g., as a partner, member, principal, shareholder or other owner (other than a holder of less than 1% of the outstanding voting shares of any publicly held company)); or

(iii)   loan money to, borrow money from, lease to, or have any other financial dealings with a Competing Business (except for ownership of less than 1% of the outstanding voting shares of any publicly held company).

(c)   ***Definition of a "Competing Business".***  You and the Company agree that a "***Competing Business***" means any individual or business (e.g., a corporation, partnership or limited liability company) engaged in our business as we are conducting it on the date your employment with us ends (including any business we are then actively considering or were considering at any time during the 12 month period ending on the date of your termination), including by way of example:

(i)   any providers of third-party logistics services, including only by way of illustration, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics or intermodal providers, or firms such as CH Robinson, Coyote Logistics, Expeditors International of Washington, Inc., Echo Global Logistics Inc., Total Quality Logistics, Roadrunner Transportation Systems, TransCore, Internet Truckstop LLC, syncreon, Neovia Logistics, Jacobson Companies and Hub Group Inc.; and

(ii)   an individual or business that otherwise competes with our business anywhere in the Restricted Territory.

(d)   ***Your Restricted Territory.***  You agree that your "***Restricted Territory***" means:

(i)   the territory within one hundred (100) miles from the principal office at which you are employed by us;

(ii)   the territory within fifty (50) miles from any of our other offices in the United States, Canada and Mexico; and

*Employment Agreement (1-8-15) -- Page 3*

       (iii)     any state or province in the United States, Canada and Mexico in which our customers are located or we perform services for or on behalf of our customers or carriers.

      (e)     ***Your Non-Compete Payments if We Terminate You Without Cause.*** While the primary consideration for your grant of your Non-Compete Covenant to us is our employment of you, as additional consideration to you for your entering into this Agreement with us, if we terminate your employment *without* Cause (i.e., your employment termination was <u>not</u> on account of your quitting or the Company's terminating your employment for Cause), then we will make "***Non-Compete Payments***" to you, ratably over the six (6) month post-employment Restricted Period in accordance with our normal payroll policies, each in an amount calculated as set forth in subsection (i) below, upon the condition that you first furnish us with a written general release in a form acceptable to us in our sole discretion.

      (f)     ***Additional Non-Compete Payments and Extension of Your Restricted Period:*** We have the right, at our discretion, to extend your Restricted Period for up to eighteen (18) consecutive months in three (3) consecutive six-month extensions, but if we do so, we will make additional payments to you during that time, as described in subsection (j)(i) below ("***Additional Non-Compete Payments***").

      (g)     ***Our Right to Waive Your Non-Compete Covenant and Avoid Non-Compete Payments:*** We recognize that our termination of your employment without Cause may occur at a time when then-relevant specific circumstances surrounding your termination and/or other business considerations cause us to conclude we do not need your Non-Compete Covenant. For that reason, we reserve the right to waive your Non-Compete Covenant, and if we elect to do so, you agree that no Non-Compete Payment will be due or payable to you.

      (h)     ***Written Notice on Employment Termination – We Let You Know Whether You Are Bound by the Non-Compete Covenant:*** If we terminate your employment, it will be by written notice to you and indicating the effective date of your termination, by which we will either advise you (x) of your six (6) month Non-Compete Covenant and the amount of your monthly Non-Compete Payments, if any, or (y) alternatively, of our election to waive your Non-Compete Covenant.

      (i)     ***Amount and Timing of Non-Compete Payments During Six (6) Month Restricted Period.*** If we terminate your employment without Cause and do not elect to waive your Non-Compete Covenant, the dollar amount of your monthly Non-Compete Payments will depend on the number of full calendar months you have been employed by us. During the post-employment Restricted Period, the aggregate amount that we will pay you, if applicable, will equal one (1) month of your "*Average Monthly Compensation*" for each full calendar month you were employed by us, up to a maximum of three (3) calendar months but not less than one (1) month (*e.g.*, if we terminate your employment without Cause after eight (8) full calendar months of employment, your Non-Compete Payment would be equal to three (3) months of your Average Monthly Compensation). This sum will be paid to you over the six (6) month Restricted Period in accordance with our payroll procedures on our normal pay periods. "***Average Monthly Compensation***" means your average monthly salary and incentive compensation you earned from us during the twelve (12) calendar months immediately preceding your termination date (or shorter period, if you were with us for less than twelve (12) months).

      (j)     ***Additional Non-Compete Payments For Six (6) Month Extensions of Restricted Period:*** If we exercise our rights to extend your Restricted Period beyond its original six (6) month term, we will give you written notice of our first election not less than thirty (30) days before the expiration of the initial six (6) month Restricted Period, and, again at our election, by giving you written notice of our second extension election not less than thirty (30) days before the expiration of the first extension.

(i)       If we exercise these Restricted Period extension options, we will pay you "*__Additional Non-Compete Payments__*" for each month of that extension period (prorated for partial months), each in an amount equal to your Average Monthly Compensation, in accordance with our payroll procedures on our normal pay periods.

(ii)      You agree that if we elect to extend the Restricted Period, any money you earn for performing services for anyone else after the first six (6) months of the Restricted Period, whether as an employee or as an independent contractor, will reduce, dollar-for-dollar, the aggregate amount of the Additional Non-Compete Payments we will pay to you. Accordingly, you agree to promptly disclose to us the amount of any such earned income, and you agree, if we ask in writing, to promptly furnish us with a copy of your federal income tax return for the applicable calendar year(s) at any time within three (3) years following the date of your termination of employment.

(k)      *__You Acknowledge the Legitimacy, Reasonableness and Fairness of Your Non-Compete Covenant To Us.__* You acknowledge that: (i) in the course of performing your duties for us you will have access to and will become highly knowledgeable about our Confidential Information; (ii) your Non-Compete Covenant is essential to protect our business and goodwill because were you to enter into activities competitive with our business you would cause us substantial harm (and not only because of your post-employment activities, but because of the impact those activities might have on our other employees and former employees); and (iii) although your compliance with your Non-Compete Covenant may prevent you from earning a livelihood in a business similar to our business, your experience and capabilities are such that you now have and will have other opportunities to earn a livelihood and adequate means of support for yourself and your dependents.

(l)      *__Consequences of Your Breach of Your Non-Compete Covenant:__* We reserve the right to use any remedies available to us in law or in equity to enforce our rights under this Agreement, generally, and your Anti-Hiring Covenant, Non-Compete Covenant, Non-Solicit Covenant and other covenants to us set forth in this Agreement, specifically. However, in addition to any other legal remedies we may be entitled to, you agree that if you breach your Non-Compete Covenant to us, you will repay us all of the Non-Compete Payments we have made to you (net of any taxes paid by you on such payments).

8.   *__Adherence to Company Policies for the Avoidance of Questionable Transactions.__* You agree that while employed by us, you will not enter into any written or verbal agreement or understanding with anyone else, whether a customer, employee, independent contractor or vendor of the Company or otherwise, directly or indirectly providing for the disbursement or receipt of any payments: (a) which involve any illegal purpose, or (b) which involve (i) illegal contributions or other distributions to any other private persons, government officials or employees, political candidates or parties, or (ii) kickbacks or bribes to any person. Further, to the extent within your control, while employed by us you will act to ensure that (i) the documentation of all of our business transactions in which you are involved properly describe the pertinent events, and (ii) the transaction records thereof are not false, distorted or misleading.

9.   *__Refraining from Disparaging Us.__* While employed by us and thereafter, you agree never to disparage, malign or impugn us or any of our officers, directors and employees.

10. *__Cooperating After Employment Ends.__* While employed by us and thereafter, you agree to fully cooperate with us in connection with any investigation, suit, action or proceeding in which you may have relevant information or testimony, including but not limited to providing testimony at depositions or trial, which cooperation and appearance you fully agree to without the necessity of a subpoena or court order.

If your assistance is required after your employment has ended, we will reimburse you for your reasonable expenses and accommodate your personal and business schedule to the extent practicable.

11. ***Giving Notice to a New Employer.*** You agree that while the restrictions that apply to you under Sections 5, 6 and 7 of this Agreement remain in effect (pertaining to your Anti-Hiring Covenant, your Non-Compete Covenant and your Non-Solicit Covenant, respectively) you will provide any new employer written notice of each of those restrictions before you accept an offer of employment and concurrently provide to us a copy of each such written notice.

12. ***Prohibited Use of Confidential Information of Your Prior Employers***. It is vital to us that you not disclose to us or use any information or materials that might constitute a former employer's confidential information you obtained while employed by that former employer. Accordingly, you (a) agree not to disclose or use any former employer's confidential information in any form unless you first obtained the prior written consent of that former employer, and (b) represent to us that you searched for and deleted any emails, documents or files prepared, generated, obtained or used by you that contain any such confidential information of a prior employer.

13. ***Authority to Enter into this Agreement; No Conflicts.*** You represent that you have the right to enter into this Agreement, that doing so is not and does not conflict with or breach any obligations you may have under any agreement you have or any court order, and that your signature on this Agreement makes it our valid and binding obligation, fully enforceable in accordance with its terms.

14. ***Prior Restrictive Covenant Agreements to Which You Are Bound.*** You represent to us that you: (a) have provided us true, correct and complete copies of any agreement to which you are subject containing non-competition, non-solicitation or similar restrictions or covenants in favor of any prior employer or other party; and (b) are free to enter into this Agreement and be employed by us in accordance with the terms of this Agreement without breaching or violating any such prior agreements.

15. ***Employee Acknowledgements Regarding Termination for Cause.*** You acknowledge that your breach of your representations, covenants and agreements set forth in Sections 2 through 14 hereof is grounds for immediate termination for Cause by us. You agree that if, subsequent to termination of your employment for any reason (but in no event more than six (6) months after the date of termination of your employment), it is determined in good faith by our CEO that we could have terminated your employment for Cause, your employment shall, at our election, be deemed to have been terminated for Cause retroactively to the date your employment terminated.

16. ***Termination Certificate.*** Immediately following your termination of employment for any reason other than on account of your death or total disability, you will promptly return to us all of our property, as required by the provisions of Section 3, and you will concurrently execute and deliver to us a termination certificate, in a form acceptable to us in our sole discretion, regarding matters such as your return of our property and your compliance, both at the time of termination and thereafter, with your obligations under this Agreement.

17. ***Governing Law; Arbitration; Consent to Jurisdiction; and Waiver of Jury Trial.***

(a)      ***Governing Law:*** This Agreement shall be governed by and construed in accordance with its express terms, and otherwise in accordance with the laws of the State of North Carolina without reference to its principles of conflicts of law.

*Employment Agreement (1-8-15) -- Page 6*

(b)    ***Arbitration of Claims Initiated by You:*** Any claim you wish to initiate arising out of or relating to this Agreement, the breach thereof, your employment with us, or the termination of that employment will be resolved by binding arbitration before a single arbitrator in the City of Charlotte, North Carolina administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(c)    ***Claims by Us Initiated by Us:*** Any claim initiated by us arising out of or relating to this Agreement, the breach thereof, your employment or its termination, shall, at our election, be resolved in accordance with Sections 17(b) or 17(d), in our sole discretion.

(d)    ***Consent to Jurisdiction and Waiver of Jury Trial:*** You hereby irrevocably submit to the jurisdiction of any state or federal court located in Mecklenburg County, North Carolina; provided, however, that nothing herein shall preclude us from bringing any suit, action or proceeding in any other court, including without limitation for the purposes of enforcing the provisions of this Section 17 or enforcing any judgment or award obtained by us. You waive, to the fullest extent permitted by applicable law, any objection you now or hereafter have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding brought in an applicable court described in this Section 17(d), and agree that you will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any court. You further agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any suit, action or proceeding brought in any applicable court described in subsection (d) shall be conclusive and binding upon you and may be enforced in any other jurisdiction. To the extent that, notwithstanding Section 17(b), you bring an action in any court, you agree to do so exclusively in the state or federal court located in Mecklenburg County, North Carolina, provided that nothing herein shall waive the Company's right to demand that you comply with Section 17(b). YOU EXPRESSLY AND KNOWINGLY WAIVE ANY RIGHT TO A JURY TRIAL IN THE EVENT THAT ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH THEREOF, OR YOUR EMPLOYMENT, OR THE TERMINATION THEREOF, IS LITIGATED OR HEARD IN ANY COURT.

18.  ***Remedies; Injunctions for Breaches of this Agreement.*** All of Company's rights and remedies may be exercised alternatively or cumulatively to the fullest extent permitted by law. You acknowledge that in addition to the acknowledgements you made in Sections 6 and 7 of this Agreement, you have considered each of the other restrictive covenants set forth in this Agreement and stipulate that those covenants are likewise reasonable and necessary to protect us and our Confidential Information, business strategies, employee and customer relationships and goodwill, now existing or to be developed in the future. You hereby: (i) agree to comply with all of the restrictive covenants, (ii) waive any right to contest the reasonableness, validity, scope or enforceability of any of the restrictive covenants, or any other claim or defense related thereto; (iii) agree that injunctive relief would be the most practical and efficient remedy for us in the event of your breach; and (iv) agree that the Company, without having to post bond or prove a lack of an adequate remedy at law, shall be entitled to injunctive relief against any breach by you of a restrictive covenant, provided that the foregoing shall not prejudice our rights to require you to account for and pay over to us any compensation, profits, gains, or derived by you related to the breach, and you agree to be so responsible for such an accounting. You further agree that if you violate your Anti-Hiring Covenant, your Non-Compete Covenant, and/or your Non-Solicit Covenant set forth in Sections 5, 6 and 7 of this Agreement, respectively, the post-employment restricted time period therein set forth shall be extended by a period of time equal to that period beginning when your activities constituting such violation commenced and ending when such violative activities terminated.

19. ***Definitions.*** This Agreement uses the following defined terms; they are intended to have the broadest meaning allowed by law to afford us the greatest protection.

"***Cause***" shall mean, in connection with your employment, (1) your dereliction of duties, failure to perform your duties hereunder, or refusal or repeated failure to follow any lawful rules or directive of the Company; (2) abuse of or dependency on alcohol or drugs (illicit or otherwise) that adversely affects your performance of duties for us; (3) commission of any fraud, embezzlement, theft or dishonesty, or any misappropriation of money or other Company assets; (4) breach of your fiduciary duties to us; (5) any act, or failure to act, in bad faith to our detriment; (6) failure to cooperate in good faith with a governmental or internal Company investigation or any of our directors, managers, officers or employees, if your cooperation is requested; (7) conviction of, or plea of *nolo contendere* to, a felony or any serious crime; or (8) your material breach of any representation, warranty or agreement created by this Agreement or any of our policies.

"***Confidential Information***" means all information, written (whether generated or stored on magnetic, digital, photographic or other media) or oral, not generally known, or proprietary to us about our businesses, affairs, operations, products, services, customer and carrier lists, pricing strategies, operating processes, business methods and procedures, information technology and information-gathering techniques and methods, business plans, financial affairs, and all other accumulated data, listings, or similar recorded matter useful in the businesses of the Company, including by way of illustration and not limitation:

- information about the business, affairs or operation of the Company developed by you or which is furnished to you by us during your employment;
- operating instructions, training manuals, procedures, and similar information;
- information about customers, carriers, vendors and other with whom we do business (e.g. customer, carrier or vendor lists, pricing, contracts, and activity records);
- information about  sales and marketing (e.g., plans and strategies);
- information about any other third parties we have a business relationship with or owe a duty of confidentiality; and
- all notes, observations, data,  analyses, compilations, forecasts, studies or other documents prepared by you that contain or reflect any Confidential Information and which is not known to the public generally other than as a result of your breach of this Agreement.

However, the Company expressly acknowledges and agrees that the term "Confidential Information" excludes information which (A) is in the public domain or otherwise generally known to the trade, or (B) is disclosed to third parties other than by reason of your breach of your confidentiality obligations under this Agreement or (C) is learned of by you after the termination of your employment from any other party not then under an obligation of confidentiality to us.

"***Proprietary Rights***" means  all right, title and interest regarding all inventions, ideas, improvements, designs, processes, trademarks, service marks, trade names, trade secrets, trade dress, data, discoveries, Work Product, and any other proprietary assets or rights.

"***Work Product***" means all works of authorship, research, discoveries, inventions and innovations (whether or not reduced to practice or documented), improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether patentable or un-patentable, and whether or not reduced to writing), trade secrets and Confidential Information, copyrightable works, and similar and related information (in whatever form or medium). As examples, this definition applies to anything to do with the Company's actual or anticipated business, research and development or existing

*Employment Agreement (1-8-15) -- Page 8*

or future products or services. It applies to the results from any work performed by you for us. It also applies to anything conceived, developed, made or contributed to in whole or in part by you while employed by us.

**20.** *Other Agreements.*

  (a)    *Notices.*  Except as otherwise provided, we can give you notice at your last known principal residence listed on our records. You, in turn, may give us notice to XPO Logistics, Inc., Five Greenwich Office Park, Greenwich, CT 06831, Attention: General Counsel. Either you or the Company may provide another address for notice by written notice to the other. Notice is deemed given as follows: when delivered personally; four (4) days after it is mailed by registered or certified mail, postage prepaid, return receipt requested; or one day after it is sent by overnight courier service via UPS or FedEx.

  (b)    *Interpretation.*  You agree that to the extent you become bound by a prior or subsequent written agreement with us setting forth confidentiality, non-solicit, anti-hiring, non-compete and similar covenants in favor of us, such prior or subsequent agreement shall be enforceable independent of this Agreement, and shall not be deemed to modify or supersede this Agreement in any way, or to be modified or superseded by this Agreement in any way. You and we acknowledge that it is our common and mutual intention that, notwithstanding the terms of any such prior or subsequent agreement, this Agreement and each such prior or subsequent agreement shall be enforceable severally, and that you will be bound by and subject to the most restrictive and comprehensive restrictive covenants in any agreement with us to which you are a party. You and we further expressly acknowledge and agree that there are no oral agreements between you and us pertaining to the subject matter hereof.

  (c)    *Amendment; No Waiver.*  You and we agree that (i) this Agreement may not be amended except in writing signed by both you and us, (ii) the application of any provision of this Agreement may be waived only by a written instrument specifically identifying the provision whose application is being waived and signed by you and us, and (iii) no waiver by either you or us of a breach by the other shall be a waiver of any preceding or succeeding breach, and no waiver by you or us of any right under this Agreement shall be construed as a waiver of any other right.

  (e)    *Your due diligence.*  You acknowledge that: (i) you have had a full opportunity to read and understand this Agreement and consult with such attorneys, accountants, business advisors, and other consultants as you deem necessary or advisable; (ii) you have had an opportunity to contribute to the revision of this Agreement as you saw fit; and (iii) this Agreement shall not be construed against one party or the other in the event of any ambiguity.

  (f)    *Survival.*  The provisions of this Agreement shall survive termination of your employment regardless of the reason, and our assignment thereof to any successor-in-interest or other assignee.

  (g)    *Severability.*  If any provision of this Agreement or its application is held invalid, such invalidation shall not affect other provisions or applications hereof which can be given effect without the invalid provisions or applications, and so that this objective may be achieved, the provisions hereof are declared to be severable. In the event of a final, non-reviewable, non-appealable determination that any covenant of yours set forth in this Agreement (whether in whole or in part) is void or constitutes an unreasonable restriction against you, such provision shall not be rendered void but shall be deemed to be modified to the minimum extent necessary to make such provision enforceable for the longest duration and the greatest scope as may constitute a reasonable restriction under the circumstances

(h)    *Counterparts.* This Agreement may be executed in multiple originals. Signatures delivered by facsimile or electronic means (including by "pdf") shall be deemed effective for all purposes.

(i)    *Headings.* The Section and subsection headings in this Agreement are for convenience only and shall not affect the meaning of any provision.

This Agreement is executed on the date shown below.

XPO LOGISTICS, INC., a Delaware corporation, for itself and its subsidiaries and affiliates

By: _____

Name:  Gordon E. Devens

Title:  Senior Vice President and General Counsel

By: _____
        Employee Signature

William Young
Employee Name (Print)

3/13/15
Date